ERNEST N. ADLER, Respondent, *v.* WILLIAM F. DEEGAN, as Tenement House Commissioner of the City of New York, et al., Appellants.

(Argued July 11, 1929; decided August 8, 1929.)

*Hamilton Ward, Attorney-General (Harold Riegelman, John W. Davis, Robert P. Beyer* and *H. H. Nordlinger* of counsel), for State of New York, appellant. The Multiple Dwelling Law is a public health measure and a valid exercise by the Legislature of the police power of the State. (*Tenement House Dept.* v. *Moeschen,* 179

N. Y. 325; *Moeschen* v. *Tenement House Dept.*, 203 U. S. 583.) The Home Rule Amendment does not limit or restrict the power of the State to enact public health measures. It prohibits only local legislation " relating to the property, affairs or government of cities " and does not create any limitation or restriction upon the theretofore existing power of the State to enact public health measures which were not general in terms or effect. (*Browne* v. *City of New York*, 241 N. Y. 96; *City of New York* v. *Village of Lawrence*, 250 N. Y. 429; *Matter of City of New York* [*Elm Street*], 246 N. Y. 72; *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110; *McAneny* v. *Board of Estimate*, 232 N. Y. 377; *Browne* v. *City of New York*, 241 N. Y. 96; *People ex rel. Joyce* v. *Brundage*, 78 N. Y. 403; *People ex rel. Lent* v. *Carr*, 100 N. Y. 236.)

*John W. Davis* for Apartment Hotel Owners Assn., Inc., et al., *amici curiæ*. The phrase, any law relating to the property, affairs or government of cities, is not defined by section 3 of article XII of the Constitution nor by section 11 of the City Home Rule Law. Furthermore, the Multiple Dwelling Law does not become a law relating to property, affairs or government of cities merely because section 3 of article XII grants to every city the power to adopt local laws relating to the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 429; *Browne* v. *City of New York*, 241 N. Y. 96.) The decision of the lower court that laws relating to the subjects of legislation, including the Tenement House Law, enumerated in section 21 of the City Home Rule Law, can only be enacted on an emergency message from the Governor and by the concurrent action of two-thirds of the members of each house of the Legislature is unfounded. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 429.) The Legislature of

the State of New York has power to enact the Multiple Dwelling Law. (*Browne* v. *City of New York*, 241 N. Y. 96.) Assuming that the Multiple Dwelling Law is special or local in its terms or in its effect, nevertheless since it does not relate to the property, affairs or government of cities, it is not violative of section 2 of article XII of the Constitution. (*Tenement House Department* v. *Moeschen*, 179 N. Y. 325; *Moeschen* v. *Tenement House Department*, 203 U. S. 583; *Block* v. *Hirsh*, 256 U. S. 135; *People* v. *Moynihan*, 121 Misc. Rep. 34; *Jackson* v. *Gilchrist*, 5 N. Y. Com. L. Rep. 87; *Pumpelly* v. *Village of Owego*, 45 How. Pr. 219; *Furman* v. *Mayor, etc.*, 5 Sandf. 16; *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110; *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *McGrath* v. *Grant*, 171 N. Y. 7.)

*Arthur J. W. Hilly*, Corporation Counsel (*William E. C. Mayer* and *Francis E. V. Dunn* of counsel), for Tenement House Commissioner, appellant. The Multiple Dwelling Law (L. 1929, ch. 713) is unconstitutional, null and void, and was passed by the Legislature in violation of the provisions of sections 2 and 7 of article XII of the New York Constitution. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 429; *Matter of Hirshfield* v. *Cook*, 227 N. Y. 297; *City of New York* v. *Trustees*, 85 App. Div. 355; 180 N. Y. 527; *City of New York* v. *Foster*, 148 App. Div. 258; 205 N. Y. 593; *Browne* v. *City of New York*, 241 N. Y. 96; *Matter of Mayor, etc.*, 246 N. Y. 72.) In enacting the Multiple Dwelling Law the Legislature delegated its powers of legislation to the local legislative bodies of cities other than the city of New York, in violation of section 1 of article III of the Constitution. (*Barto* v. *Himrod*, 8 N. Y. 483; *People ex rel. Unger* v. *Kennedy*, 207 N. Y. 533; *People* v. *Klinck Packing Co.*, 214 N. Y. 121.)

*John Broches Aronoff* for respondent. The Multiple Dwelling Law is a local law and applies both in terms and

in effect only to the city of New York. (*Matter of City of New York [Elm Street]*, 246 N. Y. 72.) Section 3 of article XII of the State Constitution shows clearly that the Multiple Dwelling Law deals with the " property, affairs or government " of the city of New York as that phrase is used in section 2 of article XII of the State Constitution. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 425.)

*Gregory U. Harmon, Corporation Counsel* (*Andrew P. Ronan* of counsel), for city of Buffalo, *amicus curiæ.*

*Clarence M. Platt, Corporation Counsel,* for city of Rochester, *amicus curiæ.* The statute in question is special and local in its terms and its effect and is not a general law which in terms and effect applies alike to all cities. (*Bareham* v. *City of Rochester*, 246 N. Y. 140; *Schieffelin* v. *Warren*, 224 App. Div. 115.) The statute in question relates to the property, affairs or government of the city and was not enacted on message from the Governor declaring that an emergency existed, and the concurrent action of two-thirds of the members of each House of the Legislature. (*Matter of Mayor of New York*, 246 N. Y. 72.)

*Joseph Sterling* for State Society of Professional Engineers and Land Surveyors, *amicus curiæ.* Section 300 of the Multiple Dwelling Law which permits the Tenement House Department of the city of New York to accept plans only from an owner or registered architect is unconstitutional in that it is " in relation to the property, affairs, or government of a city." (*Devoy* v. *City of New York*, 36 N. Y. 449; *Rathbone* v. *Wirth*, 150 N. Y. 459; *People ex rel. Bush* v. *Houghton*, 182 N. Y. 301.)

CRANE, J. The Multiple Dwelling Law, entitled " An Act in relation to multiple dwellings, constituting chapter sixty-one-a of the consolidated laws " (L. 1929, ch. 713), supersedes the Tenement House Law (L. 1901,

ch. 334, as amended), as applicable to the city of
New York, and changes its provisions. It was passed in
the manner in which other State legislation is adopted,
that is, by a majority vote, and not as an emergency
measure, by the concurrent vote of two-thirds of the
members of each house of the Legislature.

The act has been challenged as unconstitutional, in
that it violates the Home Rule provision of the State
Constitution, article XII, section 2. The Special Term
has decided that this Multiple Dwelling Law relates to
the " property, affairs or government " of New York
city, and, therefore, should have been adopted by the
action of two-thirds of both houses of the Legislature,
upon an emergency message from the Governor. The
law has, therefore, been declared unconstitutional.

The determining factor on this appeal is the meaning
of the words, " property, affairs or government of cities,"
as used in section 2 of article XII of the Constitution
of this State. By section 4 of that same article it is
provided that the power of the Legislature shall not be
deemed to be restricted in relation to matters other than
" the property, affairs or government of cities." What-
ever be the meaning of section 3 of this same article,
enumerating the powers which may be given to cities,
it is certain that by the express provisions of this article
of the Constitution, the Legislature by a majority vote
has full power over all matters pertaining to the city of
New York, except such matters as are included within
the meaning of the words, " property, affairs or govern-
ment of cities."

What do these words mean? Their colloquial signifi-
cance would indicate that anything touching or pertaining
to the affairs of a city or of the people thereof was within
the breadth and scope of their intent. If we are satisfied
with first impressions, if we do not look beneath the
surface of the matter, if we ignore the past use of these
words, then we may very well say that the statute under

review, known as the Multiple Dwelling Law, is unconstitutional. If, however, we pause to consider whether these words had a special, legal significance when used in the constitutional amendment, we find that there is another side to the question, and it is that which I desire to present as the basis for my conclusion.

Words, like men, grow an individuality; their character changes with years and with use. It is common knowledge that many words have a meaning at law different from that of common speech — carelessness, negligence, fraud, theft and the like — have a limitation not always given to them by the dictionary. Thus, we may expect that if the words, " property, affairs or government of cities," have been previously used in statutes and in decisions with a limited meaning, this limited meaning was carried into article XII of the Constitution.

What subject more vitally touches the affairs of the city than rapid transit? The recent litigation in the Federal courts, and the decision of the United States Supreme Court, show how necessary rapid transit is to urban life. (*Gilchrist* v. *Interborough Rapid Transit Co.*, 279 U. S. 159.) Stop the railroads, surface, subways or elevated, in the city of New York, and the calamity, almost immediate, would be too direful for contemplation. An affair of the city! Any man in the street or in the ordinary walks of life, conversant with New York city, would say that the railroads, already half municipally owned, were a very important and vital affair of the city of New York. Yet this court, in *Admiral Realty Co.* v. *City of New York* (206 N. Y. 110), distinctly stated in its opinion that the Rapid Transit Act, dealing as it did directly with the railroads in New York city, was not a law which related to municipal property and affairs. It is said the law was adopted not only for the benefit of cities to be affected, but for the public at large. The words " property, affairs or government of cities " appeared in the Constitution of 1894 as follows: " Laws

relating to the property, affairs or government of cities, and the several departments thereof, are divided into general and special city laws; general city laws are those which relate to all the cities of one or more classes; special city laws are those which relate to a single city, or to less than all the cities of a class."

If the Rapid Transit Act under discussion in the *Admiral Realty Co.* case related to the " property, affairs or government of a city," and was a special law, it came within those provisions of the Constitution which required its submission to the Mayor of the city of New York for his approval. This court, as above stated, decided that the Rapid Transit Act, dealing with railroads, whether of one or more cities — it made no difference — was not a law relating to the " property, affairs or government of cities." You see how slowly we must go in jumping at conclusions as to what the people of this State meant by the " affairs of a city," — much less, very much less, than most people consider the word " affairs " to mean.

Since 1894 the words " property, affairs or government of cities " have become words of art, and were so used in the recent Home Rule Amendment, now known as article XII of the Constitution. Whatever other reasons there may have been for deciding the *Admiral Realty Co.* case, the fact remains that this court gave to these words, " property, affairs or government of cities," a special limited meaning, and we would be unfair to the people of this State if we now changed their meaning. When the people put these words in article XII of the Constitution, they put them there with a Court of Appeals' definition, not that of Webster's Dictionary.

The same thing holds true regarding the Public Service Commission Law. (*Matter of McAneny* v. *Board of Estimate*, 232 N. Y. 377.) The law applied in effect to the city of New York; it controlled the transit in that city, an affair, apparently, of the city of New York. Yet this court said: " Rapid transit for the city of New York has, for

many years, been a matter of public interest, affecting not only the people of that city, but of the whole State. It has been generally regarded as a State affair. The history of legislation on the subject shows it."

The fact that that law was also considered a general, instead of a local law under the Constitution of 1894, was another point in the case, but in no way affected or weakened the statement which I have just quoted. It is too late for us at this time to say that this court, or our former associates were not obliged to pass upon all the questions involved in these cases which I have cited. Whether necessary or unnecessary, the fact is they did pass upon them, and the Legislature and the people, in adopting the Constitution, were justified in using words in the sense in which they had been judicially explained and limited.

Apparently nothing so nearly affects the property or government of a city as its jurisdiction. To change the boundaries of the city of New York either by contraction or expansion touches it in its government and in its property, using the word " property " in its widest sense as associated with jurisdiction. Yet we held in *City of New York* v. *Village of Lawrence* (250 N. Y. 429) that a change in boundary by the Legislature was not a law coming within the Home Rule provisions. The degree of the change, or its importance, could not and did not affect the principle. It either was or was not a law touching the property and government of the city, and we held that it was not. Such was also the ruling of this court regarding chapter 548 of the Laws of 1912, providing for the creation of Bronx county. (*People ex rel. Unger* v. *Kennedy*, 207 N. Y. 533.) (See, also, *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Browne* v. *City of New York*, 241 N. Y. 96.)

The Tenement House Act (L. 1901, ch. 334, as amended by L. 1902, ch. 352) was brought in question in the case of *Tenement House Department of City of New York* v.

*Moeschen* (179 N. Y. 325). This act required the removal of certain school sinks, privy vaults, etc., in the city of New York. Its constitutionality was questioned by very able counsel, and defended by the Corporation Counsel of the city of New York. In the opinion of the court we find this: "The governor, in 1900, appointed a committee known as 'The Tenement House Commission,' in accordance with chapter 279 of the laws of that year, to make a careful examination into the healthfulness of tenement houses in cities of the first class, and to make 'such recommendations as it deems wise to enable the best and highest possible condition for tenement-houses in said cities to be attained.'" The Tenement House Act was the result of the work of this Commission, which became chapter 334 of the Laws of 1901. A quotation is given from an opinion of Judge PECKHAM, who refers to the spread of disease due to the possibly filthy conditions and pestilent breeding places in the city of New York.

While this case does not touch the point now presented to this court, the fact remains that the police power of the State, in so far as it dealt with the health of the people of the State, including those in the large cities, has ever since, if not always, been considered a State affair, a matter in which the people of the State as a whole were interested, as contrasted with a local affair in which the people of the cities had the first and final say. No point was made that the Tenement House Act was an affair of the city.

That this statement of mine is quite accurate may be gathered from the act of the New York State Legislature, following the immediate adoption of the Home Rule provision of the Constitution, and the commands therein contained. Section 3 of article XII reads: "The Legislature shall, at its next session after this section shall become part of the Constitution, provide by general law for carrying into effect the provisions of this section."

Thereafter the Legislature passed the City Home Rule

Law (L. 1924, ch. 363; Cons. Laws, ch. 76), section 21 of which provided that the local legislative body of a city shall not be authorized to adopt a local law which changes any provision of the Tenement House Law. If the matters covered by the Tenement House Law were, and had been considered local matters (property, affairs or government of cities), the power of the Legislature over such provisions would have been nil, and that of the cities plenary. It is beyond the power of the imagination to conceive that such an important matter as the health of people in tenements should have been left by the people in this State beyond the power of the Legislature or the city, to legislate upon except as an emergency measure. Either the State had the power to deal with it, or the city had, and to my mind this is the only reasonable way of looking at it. It has been said below that the city has no power to pass as a local measure a multiple dwelling law. If the State has not the power, the city must have it. Power of this important and vital nature would not be left to inference or indirection.

The fact is that the State Legislature, in drafting those provisions which subsequently, by the vote of the people, became the Home Rule measure in the Constitution, knew and realized that the words " property, affairs or government of cities " did not include health measures, or those already covered by the Tenement House Law, which of its nature is a health measure.

Immediately after the adoption of the Constitution, this same Legislature of the State of New York passed the City Home Rule Law, specifically exempting from the power of the cities the right to make changes in any provision of the Tenement House Law. The Legislature of the State of New York is one continuous body, although the individuals composing it may change. Its vital spark, giving it mentality, intent and purpose, we must assume, continues the same from year to year. When amendments to the Tenement House Law were passed,

they were not considered as city affairs within the meaning of the Constitution before or after amendments effective in 1924. (See L. 1926, ch. 176; L. 1927, ch. 674.)

The Multiple Dwelling Law, here under discussion before us, is the Tenement House Law with another name. It is a result of the remodeling of the Tenement House Act, after a careful study by a Commission appointed for the purpose of surveying the entire field, and adopting the best known measures for the safety and health of the people of New York.

Reason as well as authority justifies a conclusion that these health measures must be a matter of State concern. The city of New York may justly be proud of its position as the largest and greatest city of this country. Size, however, is of minor importance; its position makes it the great port of entry for the people of this entire land. Immigrants from all over the world, of all classes and descriptions, land at Ellis Island, and virtually enter the city of New York. It has been the first introduction to American life, which most of those of foreign birth have had. Many of these people settle in this city, either permanently or temporarily, before going west. More than this, a mere look at the daily press will give some idea of how many thousands of people — men, women and children — from all over the United States and Canada, come to New York city to depart upon steamers for Europe and other places. It has been said, and perhaps truly, that the theatres of New York are maintained almost entirely by the finances of those non-residents who frequent New York city during some portion of the year. The business of the country, if not the world, is more or less centered in New York city. The point of all this is, that New York city with its millions is made up very largely of those who pass through it, or temporarily reside in it. It is a shifting population, scattering over all portions of the State and to the four corners of the earth. A pestilence, a disease, anything

that affects the health and the welfare of the city of New York, touches almost directly the welfare of the State as a whole. We need not deal with the financial results to the State following good or bad hygienic conditions. We may well confine ourselves more particularly to the social element and those things which government has to-day considered as part of its governmental function, the bodily and mental health of its inhabitants. The health of a community, we have discovered, thanks to science, has more to do with the general prosperity and welfare of a State than its wealth or its learning or its culture. A happy, contented citizen is the foundation of the future; he is the bulwark of the Commonwealth.

The police power of the State has never been questioned when it dealt directly with hygienic conditions of a community. Unless the intent is clear or reasonably certain it should not now be limited or whittled away by the reform known as Home Rule for cities. Let us recognize in our decision the useful division which custom and practice have made between those things which are considered State affairs, and those which are purely the affairs of cities.

The Multiple Dwelling Law is constitutional, for the reasons stated, and the judgment should be reversed and the complaint dismissed, with costs in this court and in the trial court.

POUND, J. (concurring). The question is whether the Multiple Dwelling Law, which applies to cities having a population of 800,000 inhabitants or more, violates the Home Rule provisions (Article XII) of the Constitution of the State of New York so far as it requires respondent to light the halls of his multiple dwelling.

The pertinent provisions of the Constitution and laws are as follows:

" § 2. The Legislature shall not pass any law relating to the property, affairs or government of cities, which

shall be special or local either in its terms or in its effect, but shall act in relation to the property, affairs or government of any city only by general laws which shall in terms and in effect apply alike to all cities except on message from the governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house of the Legislature.

" § 3. Every city shall have power to adopt and amend local laws not inconsistent with the constitution and laws of the State, relating to the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of all officers and employees of the city, the transaction of its business, the incurring of its obligations, the presentation, ascertainment and discharge of claims against it, the acquisition, care, management and use of its streets and property, the wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or subcontractor performing work, labor or services for it, and the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. The Legislature shall, at its next session after this section shall become part of the constitution, provide by general law for carrying into effect the provisions of this section.

" § 4. The provisions of this article shall not be deemed to restrict the power of the Legislature to enact laws relating to matters other than the property, affairs or government of cities.

" § 5. The Legislature may by general laws confer on cities such further powers of local legislation and administration as it may, from time to time, deem expedient."

City Home Rule Law (L. 1924, ch. 363; Cons. Laws, ch. 76), at section 21, paragraph 6, specifically restricts the local legislature from adopting a local law which " changes any provision of the tenement house law; " at section 30 declares: " It is not the intention of the legis-

lature * * * to restrict the powers of the legislature to pass laws regulating matters of state concern as distinguished from matters relating to the property, affairs or government of cities;" and at section 11 specifically limits the application of article XII, section 3, as to the power of the city to adopt and amend local laws of the character enumerated therein to such local laws as are "in relation to the property, affairs or government of the city."

The law is general in form although limited in effect to the city of New York, except as other cities or villages may adopt it by local laws (§ 3). If the Legislature is not hampered or restrained by the provisions of the Home Rule Amendment, its constitutionality must be upheld.

A division between State affairs and city affairs is plainly indicated, both by the Constitution and the City Home Rule Law passed pursuant to article XII, section 3, *supra*, to carry into effect the provisions of that section. That the amendment divides things that in their nature are indivisible by any scientific method of exclusive and inclusive classification has been suggested by an authority on the subject (McBain, 37 Pol. Sc. Q. 655). The line of demarcation must be drawn by the court as cases arise. The Constitution makes no attempt to define laws relating to the property, affairs or government of cities, nor has the Legislature, nor shall we at this time. One thing is clear. Under the carefully chosen language of the amendment a law may relate to or affect cities as civil divisions of the State or centers of population, without necessarily relating to the property, affairs or government of such cities. The well-recognized principle controls that all legislative power remains in the State Legislature, except as the Constitutions, State and Federal, have limited such power. As to general laws, it follows that the Legislature is supreme and its hands are free, except that it may no longer pass laws which,

although general in terms, in effect relate exclusively to the property, affairs or government of a city or cities and do not within their field apply alike to all cities. (*Matter of Mayor, etc., of N. Y.* [*Elm Street*], 246 N. Y. 72.)

The authority of the Legislature to pass general health laws limited only to cities of the first class — New York and Buffalo — and to tenement houses in such cities, under the former provisions of the Constitution, was upheld in *Tenement House Dept.* v. *Moeschen* (179 N. Y. 325; affd., 203 U. S. 583).

A classification which included only such cities and such buildings was said to offend no existing constitutional provision. "An act necessary for the city of New York might not have the slightest application to Albany or Buffalo." The protection of the public health and safety is one of the acknowledged purposes of the police power of the State. The effect of a great conflagration in a crowded city, an epidemic, congestion in city slums, unsafe construction of hotels, all these and much besides could not be localized. Their effect upon the general welfare might be far-reaching. A non-resident might stumble and fall in the unlighted hallway of a multiple dwelling. The provision is for the benefit of all who have occasion to use the dwelling and not for the city of New York and its inhabitants alone.

The Legislature may make reasonable classifications based on population in order to enact health laws " which might be suitable and proper for the city of New York, a great seaport, exposed to peculiar dangers from infection and disease [which] might be unnecessary, burdensome and oppressive if applied to an inland city like Buffalo." (*People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367.) Although the Tenement House Law was adopted as a general city law applicable to cities of the first class, the decision upholds a separate classification of large cities as proper for measures affecting the public health. The

mind of the court as was expressed in the opinion, was concentrated on the importance of the powers of legislative classification in accordance with population rather than on any division between State and city affairs.

On other subjects of legislation, State affairs have been held to include matters localized in their direct application to a single city. The Rapid Transit Act (L. 1912, ch. 226), which in terms applied to all cities of over one million inhabitants, was upheld as constitutional against the contention that it was a local city law, although in effect it applied only to the city of New York. " It was adopted not only for the benefit of the cities which, of course, would be affected, but of the public at large." (*Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110.) Again, in *Matter of McAneny* v. *Board of Estimate* (232 N. Y. 377) it was held that rapid transit in the city of New York " has been generally regarded as a State affair."

These cases arose under the former article XII of the Constitution of 1894 which permitted a classification of the city of New York in terms of population applicable only to it. The underlying principle that tenement house legislation for large cities is a matter of State concern is not affected by the change. Under the Home Rule Amendment, as CARDOZO, J., pointed out in the *Elm Street Case (supra)*, a forced and unnatural classification, which in effect applies to the property, affairs or government of a single city, may not, despite its pretense of generality, survive judicial scrutiny. Nothing in that decision precludes the Legislature from making a proper classification, based on population, in matters of State concern, although only a single city is predominately and peculiarly affected thereby. Nothing in the amended Constitution prevents the Legislature from passing laws general in terms but local in their immediate application, so long as it does not act in relation to the property, government or affairs of cities as such. The Home Rule Amendment has not restricted the legislative powers of

the State in this regard. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 429.)

The Home Rule Amendment did not create a multitude of city states, self governing in all respects in matters affecting " the government and regulation of the conduct of [their] inhabitants and the protection of their property, safety and health." (Art. XII, § 3.) Local laws must be " not inconsistent with the constitution and laws of the State." The Legislature may by general laws confer upon cities powers of local legislation and administration in matters of State concern when it deems expedient to do so (Art. XII, § 5), or it may act in its own way in such matters. To exact that laws peculiarly adapted to conditions existing in the city of New York must apply alike in terms and effect to all cities, is to deny to the Legislature all powers of reasonable classification based on population in matters within its field of operation.

The conclusion follows that the life, health and safety of the inhabitants of the city of New York are not, under the Home Rule Amendment, a city concern which can be localized and delimited by the city boundaries, but are the concern of the whole State; that the Multiple Dwelling Law so far as here questioned is a general health law (*Admiral Realty Co.* v. *City of New York, supra*, p. 139) which does not, either in terms or effect, relate to the property, government or affairs of a single city within the meaning of the amendment; that it is based on a reasonable classification which properly separates the city of New York with its population of 6,000,000 and upwards from all other cities of the State; from Buffalo with its estimated population of 500,000 and upwards, as well as from the little cities of 10,000 population or less; and that, tested by the legislative interpretation of its purpose and by the decisions of this court, it cannot be condemned as a mere subterfuge, scheme or device to evade wholesome constitutional provisions. It must, therefore, be upheld as against the attack made by the respondent upon

it. Other questions may arise in the future which will require us to consider other features of the law.

The judgment should be reversed and the complaint dismissed, with costs in this court and in the trial court.

CARDOZO, Ch. J. (concurring). The Multiple Dwelling Act is aimed at many evils, but most of all it is a measure to eradicate the slum. It seeks to bring about conditions whereby healthy children shall be born, and healthy men and women reared, in the dwellings of the great metropolis. To have such men and women is not a city concern merely. It is the concern of the whole State. Here is to be bred the citizenry with which the State must do its work in the years that are to come. The end to be achieved is more than the avoidance of pestilence or contagion. The end to be achieved is the quality of men and women. Nothing herein contained, says the statute (City Home Rule Law, § 30), shall "restrict the powers of the legislature to pass laws regulating matters of state concern as distinguished from matters relating to the property, affairs or government of cities" (cf. § 11, subd. c, as amended in 1928; Constitution, art. XII, § 4). If the moral and physical fibre of its manhood and its womanhood is not a State concern, the question is, what is? Till now the voice of the courts has not faltered for an answer (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367; *Admiral Realty Co.* v. *City of N. Y.*, 206 N. Y. 110; *Matter of McAneny* v. *Bd. of Estimate*, 232 N. Y. 377; *Augustine* v. *Town of Brant*, 249 N. Y. 198, 204; *Cleveland* v. *City of Watertown*, 222 N. Y. 159, 174; cf. *Maximilian* v. *Mayor*, 62 N. Y. 160; *Tenement House Dept.* v. *Moeschen*, 179 N. Y. 325; *Prime* v. *City of Yonkers*, 192 N. Y. 105).

A wide field remains for action by the city, and this, too, within the field of welfare legislation. Many welfare measures are city affairs solely. If a city lays out a park or builds a recreation pier or provides for public concerts,

it is exercising the police power, and is acting for the welfare of its inhabitants, yet acting in a matter that is distinctively its own affair, a matter that is bound up with its own business, its own finances, its own corporate activities. The State may not say by local law adopted by a majority vote, you must lay out a park in such a place or of such a size or at such a time. The State may have its own parks, but that is another matter. Even in situations where the affair to be regulated does not involve a corporate activity of the city, is not a city affair in that sense, but is merely a matter of local interest or concern, the State, acting by local laws and without an emergency message, must keep its hands off unless a State concern is involved or affected, and this in some substantial measure. There may be difficulty at times in allocating interests to State or municipality, and in marking their respective limits when they seem to come together. If any one thing, however, has been settled in this realm of thought by unison of opinion, it is the State-wide extension of the interest in the maintenance of life and health. The advancement of that interest, like the advancement of education, is a function of the State at large. I do not know how many statutes we shall have to uproot, nor where we shall have to draw the line hereafter, nor what confusion we may be inviting, if we speak differently now.

The act is not a zoning resolution, nor the equivalent of one, though in it are provisions as to the height and area of buildings. A zoning resolution in many of its features is distinctively a city affair, a concern of the locality, affecting, as it does, the density of population, the growth of city life, and the course of city values. Whatever restraint in respect of height and area is imposed by this act upon the zoning power of the locality is incidental and subordinate. The power is left intact except for the declaration of a *minimum* below which restriction may not fall, a minimum believed to be essen-

tial to healthful and decent living. If the minimum is maintained, ordinance and resolution may add to it at will (Multiple Dwelling Act, § 365). A different question would be here if the city were restrained from increasing the restriction in respect of height and area as well as from reducing it. The concern of the State to protect the health and welfare of its inhabitants may not stand in the way of action by the city consistent with the ends envisaged by the State, but adding greater safeguards with reference to related ends that are municipal or urban. So the statute says. So, it may be argued, the law would say anyhow, if the statute had been silent. There can be no legitimate concern of the State, or none at least is now suggested, that would throw open Murray Hill to industry and trade if the city authorities were to hold fast to the belief that it should be preserved for residences only. We may say the like of other changes whereby density of population would be magnified, with new pressure on streets and sewers and means of transportation, against the effort of the locality to distribute or reduce it. Interference in such a degree would be intrusion upon a concern or interest of the city without a compensating offset in the advancement of a concern or interest of the State. So, at least, we may assume until something of the kind is threatened. It has not been threatened yet. The city may lay out its districts as it pleases. It may make the height of its tenements even lower, and their courtyards even larger. All that it may not do is to deny to its inhabitants the light and the air, the sanitary safeguards, and the protection against fire, without which healthy human beings cannot live to be the mainstay of the State, the source and the pledge of its prosperity and power.

The consequences of a different holding are indeed disquieting. By section 2 of the Home Rule article, the Legislature may not act with reference to the property, affairs or government of cities through the usual

forms of legislation except by general laws, and by the same section a law is not general unless it applies to every city. A tenement law applicable to New York, Buffalo and Rochester would not be a general law. A tenement law applicable to every city except Salamanca or Long Beach would not be a general law. If one were to go through the statute books and pick out the acts relating to health or education or public order that apply to cities other than New York, or that apply to New York and not to other cities, acts passed since the adoption of the Home Rule Amendment and by a majority vote, the list would be impressive. If all these acts are in truth invalid, we must submit to the inconvenience that would result from such a holding. It is not one to be invited The very fact that by the City Home Rule Law, contemporaneous substantially with the amended Constitution, the Tenement House Law was excepted from the class of local statutes affecting the affairs of cities is evidence that it was understood by contemporaneous opinion to be matter of State concern and not an affair of the locality. So, I think, it is, if matters of State concern are to have the meaning and effect that has been theirs throughout the years (*Prime* v. *City of Yonkers, supra,* and cases cited). The precedents of legislation (see *e. g.,* Public Health Law [Cons. Laws, ch. 45], § 2-b, §§ 70, 71; City Home Rule Law, § 21; Penal Law, § 722; Labor Law [Cons. Laws, ch. 31], § 474-a; Tenement House Law, as amended by L. 1926, ch. 176; L. 1927, ch. 674; L. 1929, ch. 691), the decisions in other States where home rule cities have been organized, or at least their reasonable implications (*In re Hoffman,* 155 Cal. 114; *St. Louis* v. *De Lassus,* 205 Mo. 578), as well as the judgment of the commentators (McBain, N. Y. Proposal for Municipal Home Rule, 37 Political Science Quarterly, 655, 669; cf. McBain, Principles and Practice of Municipal Home Rule, pp. 138, 176, 203, 257), converge to that conclusion.

If the act is not in a prohibited sense an interference

with municipal affairs, neither is it a change of municipal government. The same city officers who have been charged with the enforcement of the law regulating the construction and use of tenements are charged with it to-day. True, their duty is to enforce a different law, and one that they are without power to modify except to increase its restrictions. But this is not a change of government. If I am right in the meaning I have given to city and State affairs, there never has been a time when the power lodged in the city officers to regulate the form of tenements has been divorced from State control. The government of the city remains precisely what it was. The power was subject in its creation to the overriding action of the State, and subject to that action it continues unimpaired.

The case for the plaintiff is not helped because cities other than New York receive a grant of broader power. Such cities are left free to adopt the statute as their own by the passage of a local law, or to ignore it altogether. What is adopted by a local law may obviously be rejected or ended by a repeal of the local law. This enlargement, if such it be, of the powers of the other cities may or may not be ineffective as to them. The question is not here. If invalidity be assumed, the only consequence would be to invalidate the change, and not to eliminate the exception. We cannot fairly say that the Legislature would have refused to give its approval to the new system imposed by this act upon the city of New York if it had been informed that there was a flaw in the provision whereby the adoption of a like system was made optional for others. The regulation of buildings in the metropolis was manifestly its chief concern. We are warned by the statute to give effect to what is valid if there is invalidity in part (§ 366). The Legislature held the view that housing conditions in the metropolis made sanitary and fire regulations imperative for the protection of life and health. It found in other cities no such pressing need

and left the form of regulation there to the control of local officers. The measure of the need and the nature of the remedy may be marked by the Legislature through statutes local in operation and preferential in effect if the interest to be promoted is the welfare of the State.

I come back, then, to this, that the fundamental question to be determined is the line of division between city and State concerns. In every case, "it is necessary to inquire whether a proposed subject of legislation is a matter of State concern or of local concern" (Fourth Report of Home Rule Commission, Legislative Document, 1928, No. 55, p. 14). If the former, the ordinary course of legislation may be followed. There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only. Illustrations of these I have given, the laying out of parks, the building of recreation piers, the institution of public concerts. Many more could be enumerated. Most important of all perhaps is the control of the locality over payments from the local purse (*Matter of Mayor, etc., of N. Y.* [*Elm Street*], 246 N. Y. 72). There are other affairs exclusively those of the State, such as the law of domestic relations, of wills, of inheritance, of contracts, of crimes not essentially local (for example, larceny or forgery), the organization of courts, the procedure therein. None of these things can be said to touch the affairs that a city is organized to regulate, whether we have reference to history or to tradition or to the existing forms of charters. Subjects such as these, not affecting the welfare of the inhabitants of the city *qua* inhabitants thereof, are not covered by the grant of power to regulate their conduct and make provision for their welfare, though the act or omission be within the municipal territory. A zone, however, exists where State and city concerns overlap and intermingle. The Constitution and the statute will not be read as enjoining an impossible dichotomy. The question to be faced is this, has the State surrendered the power to enact

local laws by the usual forms of legislation where subjects of State concern are directly and substantially involved, though intermingled with these, and perhaps identical with them, are concerns proper to the city? So far as judicial precedents in the courts of New York are available for guidance, they deal with the interpretation of the " affairs " of cities under the provisions of article XII of the Constitution as it stood before its revision in 1923 (*People ex rel. Einsfeld* v. *Murray; Admiral Realty Co.* v. *City of N. Y.; Matter of McAneny* v. *Bd. of Estimate, supra*). They all point, however, to the holding that affairs, though concerns of a city, are subject, none the less, to regulation through the usual forms of legislation, if they are concerns also of the State. So far as legislative practice since the constitutional amendment is available for guidance, it points for the most part the same way. Finally, these aids to construction are supplemented and confirmed by the basic principle that the power to adopt laws according to the usual forms of legislation resides with the Legislature except in so far as it has been limited or surrendered, and that neither limitation nor surrender will be inferred unless intention is revealed with reasonable clarity.

" The provisions of this article shall not be deemed to restrict the power of the Legislature to enact laws relating to matters other than the property, affairs or government of cities " (Constitution, art. XII, § 4). The reservation of this power is merely another way of saying that the Legislature is unfettered as to " matters of state concern " (City Home Rule Law, § 30). How great must be the infusion of local interest before fetters are imposed? There is concession even by the plaintiff that if the subject be " predominantly " of State concern, the Legislature may act according to the usual forms. But predominance is not the test. The introduction of such a test involves comparisons too vague and too variable, too much a matter of mere opinion, to serve as an objective

standard. To adopt it is to infect our legislation with the virus of uncertainty. The city has power under its charter to define the offense of disorderly conduct in its streets. The State by a law applicable in the city of New York and no where else defines disorderly conduct in other terms (Penal Law, § 722, as amended in 1924). The validity of the new definition has not been doubted, yet concerns both State and local are affected by the change. Who shall say in what proportion? Considerations of " more or less " will lead us in such a case, and in many others, into a morass of indecision. The test is rather this, that if the subject be in a substantial degree a matter of State concern, the Legislature may act, though intermingled with it are concerns of the locality. Measured by that test, this statute must prevail. I do not say that an affair must be one of city concern exclusively to bring it within the scope of the powers conferred upon the municipality by section 3 of the Home Rule article and section 11 of the City Home Rule Law in cases where the State has not undertaken to occupy the field. I assume that if the affair is partly State and partly local, the city is free to act until the State has intervened. As to concerns of this class there is thus concurrent jurisdiction for each in default of action by the other. The power of the city is subordinate at such times to the power of the State, but may be exerted without restraint to the extent that the two can work in harmony together.

The judgment should be reversed and the complaint dismissed.

LEHMAN, J. (dissenting). The Multiple Dwelling Act (Laws of 1929, chap. 713) contains a legislative finding: " It is hereby declared that intensive occupation of multiple dwelling sites, overcrowding of multiple dwelling rooms, inadequate provision for light and air, and insufficient protection against and defective provision for escape from fire, and improper sanitation of multiple dwellings

in certain areas of the State are a menace to the health, safety, morals, welfare, and reasonable comfort of the citizens of the State; and that the establishment and maintenance of proper housing standards requiring sufficient light, air, sanitation, and protection from fire hazards are essential to the public welfare. Therefore the provisions hereinafter prescribed are enacted and their necessity in the public interest is hereby declared as a matter of legislative determination."

The provisions "hereinafter prescribed" apply in terms only to cities having a population of eight hundred thousand inhabitants or more except that the local legislative body of any other city, town or village may by local law adopt the provisions of the act or may, at its will, ignore them. Since New York City is the only city in the State of New York with a population of eight hundred thousand or more, at present the act in effect applies only to that city. As to the City of New York the Multiple Dwelling Act purports to supersede the Tenement House Law and to regulate the occupation and construction of multiple dwellings. It provides new standards for the maximum height of such dwellings, and for the proportion of lots which may be occupied by such dwellings erected thereon. Provision is made for such light, air and measures of sanitation as the Legislature deems wise and for protection against fires and other dangers.

We may assume that the legislative finding is based upon the existence of facts known to the Legislature; indeed many observant and public-spirited citizens have mentally made the same finding based upon their common experience. We may assume that even though the act may contain imperfections the new standards created for multiple dwellings in the City of New York represent an advance over the old standards and that the act, if valid, would prove of substantial benefit to the inhabitants of the City of New York. The number of welfare associa-

tions and other semi-public bodies, which have intervened in this case in support of the validity of the act, seems to lend weight to the assumption. Considerations based upon the policy and wisdom of legislation are irrelevant in the determination of the question of whether the Legislature had power under the Constitution of the State to act.

Protection of the health and morals and safety of its citizens and inhabitants lies, beyond question, within the police power of the State. The State has not surrendered or been deprived of this power but in the Constitution of the State the State itself has decreed how this power shall be exercised and by what governmental bodies. The plenary power of the Legislature in relation to the property, affairs and government of cities has been restricted by article 12 of the Constitution. The Legislature has chosen to confine to the City of New York its remedies against the "intensive occupation of multiple dwelling sites, overcrowding of multiple dwelling rooms, inadequate provision for light and air, and insufficient protection against and defective provision for escape from fire, and improper sanitation of multiple dwellings" which the Legislature has found exist "in certain areas of the state." The question before us is only whether the act so confined is an act in relation to the "property, affairs or government" of the City of New York.

Within that field the plenary power of the Legislature is restricted by section 2 of article 12 of the Constitution, generally known as the Home Rule Amendment. Even before the passage of that amendment the plenary power of the Legislature had been restricted in some degree within the same field. The restrictions have been made more rigid. No new definition of the limits of the field within which those restrictions are effective is contained in the amended Constitution. The amended article uses the same language in defining that field that was used in the Constitution before the amendment. We must give

to that language the meaning previously attached to it by authoritative decisions of this court. In other fields the power of the Legislature remains unrestricted.

The Multiple Dwelling Act was passed without a message from the Governor and without the concurrent action of two-thirds of the members of each house of the Legislature. It is said that it is nevertheless valid because it was enacted under the police power as a measure for the protection of the health, safety and welfare of the citizens of the State and though limited in effect to the City of New York it does not relate to the property, affairs or government of that city.

It is clear that in the exercise of the police power of the State the legislative authority may reasonably adopt regulations for the City of New York which would have no reasonable application to other localities. Obviously the health, safety and welfare of the inhabitants of the City of New York and those who visit that city may be endangered by conditions created by its size, situation or local conditions which could not exist in cities like Sherrill. Remedies applied to local conditions when such conditions threaten the health and welfare of the citizens of the State may constitute a matter of State concern and in the division of functions between the governments of State and City the right to legislate in relation to all matters affecting the health, safety and welfare of citizens of the State may be intrusted by the Constitution exclusively to the government of the State. Then such legislation even though local in its application does not relate to the " property, affairs or government " of the locality. So this court has stated in the cases decided before the Home Rule Amendment to the Constitution was passed, which are cited in the opinions of my associates.

At that time the cities of the State were not granted by the Constitution any authority to exercise the police power of the State. The Legislature, it is true, might confer upon local legislative bodies a limited right of

legislation in regard to local matters but in so far as such bodies received authority to exercise in local matters a portion of the police power of the State they acted under a delegated power as agents of the government of the State rather than as agents of the government of the city.

The Home Rule Amendment in section 2 of article 12 made more rigid the restrictions upon the power of the Legislature in the field of the property, affairs or government of cities. In section 3 it provided that all cities must have certain legislative functions. In unambiguous language it commanded that "Every city shall have power to adopt and amend local laws not inconsistent with the constitution and laws of the State relating to * * * the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health. The Legislature shall, at its next session after this section shall become part of the constitution, provide by general law for carrying into effect the provisions of the section."

It cannot be gainsaid that in this section of the Constitution cities receive not from the Legislature but from the sovereign people of the State, authority to exercise some part of the police power of the State and the exercise of that authority is made the function not of a designated local legislative body or city officer but of the city itself. Its exercise does not rest upon delegation of power by the Legislature. Within its limited scope it is derived from the same fundamental law, from which the Legislature derives its own general power. The State, as I have said, has not surrendered its police power but it has to some extent divided it between the Legislature and the cities and clearly the exercise of the function bestowed on cities is a matter of city government. It is in the light of the enlarged scope of the government of cities that we must test the validity of the Multiple Dwelling Act.

The Multiple Dwelling Act, like the Tenement House Law which it purports to supersede in the City of New

York, contains many provisions which directly affect the health and safety of inhabitants of the city and perhaps the welfare of the city itself. I recognize that the welfare of the State as a whole is bound up in the welfare of its individual citizens and that the welfare of each citizen may well be a matter of State concern. Some of the provisions of the law may furnish protection indirectly, at least, to citizens of the State outside the city. Benefit to be derived from other provisions by parts of the State outside of the city seems decidedly remote. Primarily the subject-matter of the act affects the City of New York and those who live in or construct and maintain multiple dwellings there. The interest of the inhabitants of the rest of the State is comparatively remote.

I may concede that preponderance of local concern in legislation would hardly prove a satisfactory test of the validity of legislation. It is not the test created by the Constitution. That test is whether the subject-matter of the law *relates* to the government of the city or to its affairs or property. In applying that test, however, the degree of interest on the part of sections of the State, outside of the city or cities directly affected by a statute, may be a relevant factor in the determination of whether encroachment, by the provisions of the statute, upon the government or legal affairs of a city, is merely incidental and insignificant or whether, in substance, the statute is one in relation to the government and affairs of a city.

I do not think that it is necessary, in this case, to determine the exact limits of the police power with which city governments are now endowed. At least there is some field in which that power may be exercised and, if the Legislature may restrict its exercise within that field, it must do so by general law. The People of the State have, it seems to me, clearly commanded that where local conditions create a need for local remedies the city shall, subject, at most, to restrictions imposed by general

law, have power to formulate and apply the local remedy and where the Legislature by act, not applying to all cities alike, seeks to remedy local conditions and to divest a city of a governmental function, theretofore exercised by it, the Legislature is subject to the restrictions imposed by the Constitution.

The City Home Rule Act is the answer made by the Legislature to the constitutional command to " provide by general law for carrying into effect the provisions of " section 3 of article 12. It contains restrictions upon the legislative power of all city governments. None may change by local law any provision of the Tenement House Law. The validity of that restriction is not now before us. We may assume, without deciding, that the restriction is valid. Then it constitutes perhaps a declaration by the Legislature that so far as permitted by the Constitution it intends to continue its control over the regulation of tenement houses where previously it has assumed control and that it regards such regulation as a matter of State concern. It may hardly be regarded as a legislative construction of the constitutional amendment that even without such restriction cities would not have power to pass local laws regulating the construction and occupation of tenement houses.

No one indeed disputes that except for that attempted restriction cities in this State may adopt local laws for that purpose as they may adopt local laws regulating the construction and occupation of factories, theatres, or other buildings. Even if, in spite of the plain language of section 3 of article 12 of the Constitution, we could say that it was not intended to confer upon cities power to adopt local laws for the government and regulation of the conduct of the inhabitants and the protection of their property, safety and health except within the narrow limits of city affairs, as that term has been previously defined, it could still not be gainsaid that the city has, by express provisions of the charter, power to pass ordi-

nances and to make regulations in regard to many matters covered by the Multiple Dwelling Act. It is provided by section 5 of article 12 of the amended Constitution that " the Legislature may by *general laws* confer on cities such further powers of local legislation and administration as it may, from time to time, deem expedient." It seems to me we should pervert the provisions of the Constitution, if we were to hold that while the Legislature may not confer upon cities additional powers of legislation except by general laws applicable alike to all, it may restrict the powers of one city by laws applicable to that city alone. I am constrained by these considerations to the conclusion that the People of the State in clear language have provided that the power of local legislation conferred upon cities is part of the government of cities and may not be enlarged or restricted except by general laws.

The vice in the act now under consideration lies, not in the fact that it imposes upon owners and occupants of multiple dwellings in New York City regulations which do not apply in other parts of the State, but that in so doing it has encroached upon a field in which the City of New York had, at least, concurrent power and has excluded or restricted the exercise of legislative power by the City of New York in a field which remains open to other cities of the State. All ordinances and regulations previously adopted by the city inconsistent with the provisions of the Multiple Dwelling Act are expressly repealed by section 365, article 11 of the act, and the legislative power previously enjoyed by the city is expressly modified by the provision of section 9, article 2, that " No ordinance, regulation or ruling of any municipal authority shall modify or dispense with any provision of this chapter." In the same field the legislative power of other cities is left untouched or is, perhaps, even increased by the provision in the statute that they may adopt the provisions of the act or ignore them.

Can it be said that a law so framed does not relate to the government and affairs of cities? A student of municipal government in New York State might regard as outside his field of study the fact that because of conditions peculiar to New York City, the construction and occupation of multiple dwellings are subject there to particular regulations. No student could regard as outside the field of municipal government restrictions upon the power of the City of New York to adopt local laws to meet local conditions while the power of other cities of the State remains unrestricted in that field. If this statute is sustained, then it would seem that the Legislature may cover by special laws almost the entire field of the protection of the property, safety and health of the City of New York and substantially exclude the government of the city from that field.

No case decided prior to the adoption of the Home Rule Amendment defining the field of government or affairs of cities is in any degree inconsistent with these views. True, the Home Rule Amendment used the same words as had been previously used in the Constitution and used them in the same sense, but the governmental functions of cities are subject to change and were changed by the amendment itself. Thereafter the cities had governmental functions in local legislation and article 12, both in its original and its amended form, restricted the Legislature in matters relating to the governmental functions of cities. (See *People ex rel. Bush* v. *Houghton*, 182 N. Y. 301; *Cleveland* v. *City of Watertown*, 222 N. Y. 159.)

So I interpret the Fourth Report of the Home Rule Commission (Legislative Document, 1928, No. 55, p. 14). " 1. In the first place it is necessary to inquire whether a proposed subject of legislation is a matter of State concern or of local concern. If of State concern, the Legislature alone may enact a law in reference to it, even though the law applies to but a single city. Such

a law, however, may be enacted by the Legislature in the ordinary way, without an emergency message. 2. Secondly, if the proposed subject of legislation relates to the property, affairs or government of a city, it is necessary to inquire whether it comes within the enumeration of subjects contained in section 11 of the City Home Rule Law. If not, legislation in reference to it, even though it relates to the property, affairs or government of a city, may be enacted only by the Legislature, under an emergency message and by a two-thirds vote. 3. Thirdly, if the proposed subject of legislation relates to the property, affairs or government of a city, it is necessary to inquire whether it comes within the powers reserved to the Legislature by section 1 of article 12 of the Constitution, or specifically denied to the city by section 21 of the Home Rule Law. In such case, legislation on the subject may be enacted by the Legislature, and probably only on an emergency message and a two-thirds vote."

Here we have a threefold classification. Only where the subject of legislation is a matter of State concern and not of local concern, so that the *Legislature alone* may enact a law in reference to it, may a law be enacted by the Legislature without an emergency message. At least where under the Constitution the city has *concurrent power* of legislation with the Legislature, the Legislature may act only under an emergency message by a two-thirds vote if the purpose and effect of such action is to alter this concurrent power.

It is said that if we hold the Multiple Dwelling Act unconstitutional we cast doubt upon the validity of many other statutes where the Legislature, in the exercise of the police power, has inserted provisions which do not in terms and effect apply alike to all cities. I may not analyze now the provisions of such statutes, for their validity is not now in question. I merely point out that in many, if not all, of these statutes the effect on the

legislative powers of the cities is not substantial. The Legislature, as we have pointed out, is restricted only when it acts in relation to the property, affairs and government of cities and an act may not fairly be said to be *in relation* to the government of a city merely because, in an incidental and unsubstantial manner it may affect the government. (*City of New York* v. *Village of Lawrence*, 250 N. Y. 429.) In testing the constitutionality of legislation, the substance, not the shadow, dictates the conclusion.

It is said " the Home Rule Amendment did not create a multitude of city states, self-governing in all respects in matters affecting ' the government and regulation of the conduct of their inhabitants and the protection of their property, safety and health.' " With at least equal force, it might be said that the Home Rule Amendment was intended to prevent the cities of the State from becoming a conglomeration of subdivisions of the State, some with reasonable powers of local legislation and others mere satrapies. Because I am convinced that if we sustain this statute, we defeat the purpose of the Constitution, I have reached the conclusion that the statute is invalid and the judgment of the court below should be affirmed.

O'BRIEN, J. (dissenting). I vote for affirmance.

If this statute relates to the " property, affairs or government " of a city and is special and local in its effect, it could have been validly enacted only on an emergency message from the Governor and by a two-thirds vote of each house (Const. art. XII, § 2). Concededly, it applies to only one city and was passed by less than a two-thirds vote without an emergency message. It does not touch any municipal property. The question, then, is whether, in the sense intended by the Constitution, it relates to the " affairs " or to the " government " of the city of New York. Never has

a definition of these words been framed by this court. Neither has an attempt been made to mark with precision the limits of the field within which a city may legislate. (*Browne* v. *City of New York*, 241 N. Y. 96, 125.) The statute interpreted in *People ex rel. Einsfeld* v. *Murray* (149 N. Y. 367) was a general excise law applicable to the entire State. In *Admiral Realty Company* v. *City of New York* (206 N. Y. 110) the Rapid Transit Act there considered was passed before the constitutional provision, with which it was claimed to conflict, went into effect. In *Matter of McAneny* v. *Board of Estimate* (232 N. Y. 377) a decision respecting the scope of article XII, section 2, as it then read, was not necessary for a determination of the appeal. Since the adoption of the Home Rule Amendment the classification of cities has been terminated and all are regarded as belonging to one class for the purposes of legislation.

Extremely difficult is the effort to dislodge from the mind the thought that, when a power or a function has been conferred or a duty or an obligation has been imposed upon a municipal corporation, those faculties become part of the city's affairs or government. " Affairs " must necessarily include something more than a mere business transaction like the execution and performance of a construction contract or the administration of an appropriation. Within its meaning seem to be comprehended all those elements which directly constitute a city's concerns. " Government " was probably not intended to be restricted to the mere form of machinery by which a public corporation regulates and controls local matters. Doubtless the word was expected by the framers of the Constitution to be interpreted by the courts as embracing a larger significance. Executive acts, both discretionary and ministerial, the adoption of ordinances and resolutions by boards of aldermen and other bodies, all go to make up that political fabric known as government. The grant to municipalities by Constitution or statute of the

right to perform functions either corporate or governmental is a recognition that such functions pertain to a city and such a grant takes them into the category of municipal affairs or government. This conclusion is strengthened, if indeed not actually demonstrated, by the language of the Home Rule Amendment. With what subjects does article XII deal except municipal property, affairs and government? Section 2 prohibits the Legislature from passing any law relating to them unless it shall be enacted in the manner therein designated. Section 3 specifically enumerates definite matters or concerns over which the power to legislate, not inconsistently with the Constitution and laws of the State, is delegated to each city. Among these specific matters is the " government and regulation of the conduct of its inhabitants and the protection of their property, safety and health." Section 5 authorizes the Legislature to confer upon cities " further powers of local legislation and administration." The grant of this extensive fragment of the police power coupled with language denoting that its exercise is regarded as part of local legislation and administration indicates an intention to range in the catalogue of municipal affairs and government all those health and safety measures which are essentially local in their operation. If the framers of the Constitution harbored a different purpose, the context is most misleading. The inference is not only reasonable, it seems almost irresistible, that they intended to include such matters within the scope of those things upon which a city may legislate until the State acts by general laws applicable to all cities or in an emergency declared by the Governor. Among the powers vested by statute in the corporation of the city of New York, previous to the adoption of the Home Rule Amendment, was authority lodged in the Board of Aldermen by section 407 of the Greater New York Charter to adopt a Building Code and in the Board of Estimate and Apportionment by

section 242-a of the same law to regulate and limit the height and bulk of buildings and to determine the area of yards, courts and open spaces in the interest of safety, health and welfare. Similar and additional elements of the police power had also been delegated by section 20 of the General City Law (Cons. Laws, ch. 21). The city accepted these grants of power and enacted a Building Code and adopted a Zone Resolution. Surely these local legislative measures are acts of government and the transactions resulting from them have mingled with and become components of the city's other affairs. Any statute directly affecting these acts or adding to or subtracting from the authority of the local officials having jurisdiction over them cannot reasonably be excluded from a list of laws which relate to the affairs or government of the city.

When the zone of municipal affairs and government overlaps that of State affairs and government, as almost invariably is the fact, how can a decision be reached except by an estimate of the extent of each and a determination in respect to the inquiry whether the interest of one or the other is overwhelming in its preponderance? The Constitution declares that cities may legislate concerning subjects relating to their own property, affairs and government but may not legislate in respect to any other matter. The same organic law continues the State's right to enact laws relating to matters other than the property, affairs or government of cities, nor does it abrogate the State's power over municipal concerns except in respect to the manner of controlling them by two-thirds vote after an emergency message or by general laws. So if the subject be one relating to city property, affairs or government, the city may act, but if relating to other matters, the State may legislate without conforming with the limitations of article XII, section 2. I do not see how the court's duty can be avoided to determine in each instance the general aspect and the dominating influence of State or city interest. A munici-

pality has no inherent interest or power. Unless its rights proceed from Constitution or statute, none exists. Every authority which it possesses, every right incident to its being, can truly be said to partake in some measure of a character akin to that of the State. A municipality is nothing except a creature and a subdivision of the State. Distinctions between corporate and governmental functions have become so nearly obliterated as to be incapable of classification on any logical basis. There is scarcely an act of local government that cannot be tortured into one of sovereignty or, in any event, into one in which all the people are to some extent indirectly interested. Probably few statutes could be proved beyond doubt to be exclusively local in their indirect influence. A law fixing the site of a garbage incinerator on a certain street in Buffalo could by an elastic interpretation be shown to have some remote effect upon the health of travelers proceeding from Duluth to Syracuse. A statute enlarging the fire department at Tupper Lake could not be held absolutely and at all events to bear no relation to the protection of the public domain within the Adirondack forests. The laying out of a park in a congested section of the metropolis or the establishment of public baths or the cleaning of a filthy street certainly affects the health and welfare of the inhabitants of the entire State to an extent at least equal to the installation of a lamp of prescribed illuminating power in a multiple dwelling. Non-residents might stumble and fall in the unlighted hallway of a multiple dwelling. Many are known to have done the same on a defective sidewalk. Courts exist for the purpose, among others, to decide, when each occasion arises, whether certain things are part of the affairs and government of the city, or of the State, within the purview of the Constitution. This statute now before us cannot, any more than innumerable other laws, be utterly divorced from all effect upon the health, safety and well-being of people residing outside New York city.

Its relation to the State as a whole must, however, be considered so extremely remote as to be almost entirely negligible. Its underlying purpose is the protection of occupants of multiple dwellings located in one city. It is · primarily, predominately, overwhelmingly and essentially local in its operation. I think the proposition is plain that, by article XII, section 2, of the Constitution, the execution of the purpose embodied in this statute relates to the affairs and government of that city, and, therefore, that any law carrying it out may be enacted only in the manner commanded by section 2 of that article. I am aware, of course, that this view might lead at times to conflicting judicial interpretations and might imperil the validity of other legislation, yet a different result bears with it the graver danger of depriving cities of the exercise of local self-government which is the cardinal principle of article XII.

When the sovereign delegated to its creatures the authority to adopt and administer measures of government, it did not release its own grasp on those subjects. It retained ultimate control over the health and safety of all the inhabitants of the State. The procedure by which this control shall be exerted was, however, restricted when it bound itself to act only in the way which it selected for itself in section 2 of the Home Rule Amendment. It can now enact a multiple dwelling law by making it applicable to every city in the State. If such legislation were to be deemed unwise, and doubtless it would be so considered, the sovereign still possesses the constitutional power, which has never been abdicated, to pass this identical statute by a two-thirds vote on an emergency message.

CARDOZO, Ch. J., and POUND, J., in separate opinions, concur with CRANE, J.; KELLOGG and HUBBS, JJ., concur in opinions of CRANE and POUND, JJ., and of CARDOZO, Ch. J.; LEHMAN and O'BRIEN, JJ., dissent in separate opinions.

Judgment reversed, etc.